UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

24cr 337 DSD/ECW

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

1. SHAWN GRYGO,
2. SHANTEL MAGADANZ, and
3. HEATHER HEIM,

    Defendants.

**INDICTMENT**

18 U.S.C. § 1349
18 U.S.C. § 1343
18 U.S.C. § 2
18 U.S.C. § 1957

THE UNITED STATES GRAND JURY CHARGES THAT:

At times relevant to the indictment:

## INTRODUCTION

1. Between March 2018 and July 2024, the defendants devised and carried out a health care fraud scheme to systematically overbill for drug and alcohol treatment services. The defendants used an outpatient drug and alcohol treatment center called Evergreen Recovery to defraud Medicaid and other health care programs by: (1) billing for treatment that was not provided; (2) billing for services that were not eligible for reimbursement; and (3) billing for treatment services clients were required to attend as a mandatory condition of remaining in free housing.

2. In order to maximize the amount of fraudulent Medicaid claims they were able to submit, the defendants used free housing in Evergreen-

DEC 18 2024
U.S. DISTRICT COURT MPLS

controlled "sober" homes" as a kickback to induce clients to enroll and remain in Evergreen Recovery treatment so that the defendants could use those clients' names and identifying information to overbill Medicaid.

## GENERAL ALLEGATIONS

3.  At times relevant to this Indictment:

### *Overview of Defendants and Subject Entities*

   a.  Evergreen Recovery, Inc. provided outpatient substance abuse treatment services at a treatment center in St. Paul, Minnesota.

   b.  Evergreen Recovery's outpatient treatment services generally consisted of both individual and group counseling sessions conducted by licensed counselors, as well as peer coaching services provided by individuals who have themselves been in recovery for one year or more.

   c.  Second Chances Sober Living, Inc. and Second Chances Recovery Housing, Inc. (together, "Second Chances") operated "sober" homes for Evergreen Recovery clients. Although nominally separate entities, Second Chances operated as part of Evergreen Recovery's business.

   d.  In 2018, defendant SHAWN GRYGO took over as the primary day-to-day operator and director of Evergreen Recovery and its client housing program.

  e. By July 2024, hundreds of Evergreen clients lived at nearly 40 Second Chances "sober" houses throughout the Minneapolis-St. Paul metropolitan area.

### *Medicaid and Medical Assistance*

  f. Evergreen Recovery's primary source of revenue was state and federal tax dollars in the form of substance abuse treatment reimbursement through Medicaid and other health care programs.

  g. Second Chances relied on Evergreen Recovery's treatment billing reimbursements for housing-related expenses.

  h. Medicaid is a government program that is jointly paid for by federal and state tax dollars. Medicaid provides health care coverage to millions of Americans, including eligible low-income adults.

  i. Each state has its own program to administer Medicaid. Minnesota's Medicaid program is called "Medical Assistance."

### *Minnesota Law Regulating Substance Abuse Treatment*

  j. In recognition of the important public health need for drug and alcohol treatment, Minnesota's Medicaid-funded Medical Assistance program allows certain substance abuse treatment services to be reimbursed as billable health care treatment.

k.  Drug and alcohol treatment does not have to be provided by a licensed physician or in a hospital or clinic setting in order to be billable through Medical Assistance.

l.  However, there are rules and requirements defining the scope of what services are billable.

m.  Minnesota Statute and the Minnesota Department of Human Services ("DHS") regulate individuals and entities seeking to provide billable drug and alcohol treatment services.

n.  For example, licensed treatment programs are required to provide certain defined types and qualities of treatment to clients. At a minimum, licensed programs are required to provide every client both individual and therapeutic group therapy by licensed drug and alcohol counselors.

o.  In 2018, Minnesota revised its law to allow licensed treatment programs to provide peer recovery support services. In contrast to group and individual counseling, peer services do not need to be provided by a licensed drug and alcohol counselor. Instead, peer services can be provided by someone who has a year or more in their own recovery and is certified to provide certain forms of education, mentoring, and other support.

p.  In addition to group and individual counseling and peer recovery support services, Minnesota law and Medicaid program rules allow

<u>United States v. GRYGO et. al.</u>

treatment providers to bill for "treatment coordination" services, so long as those services meet certain eligibility requirements.

## THE SCHEME TO DEFRAUD

4. Between in and around March 2018 and July 2024, SHAWN GRYGO, SHANTEL MAGADANZ, and HEATHER HEIM, and others known and unknown, devised and carried out a scheme to systematically overbill Medicaid and other health care programs.

5. During that time frame, the defendants submitted invoices seeking reimbursement for over $30 million from Medicaid and Medicaid-funded health care programs.

### *The Defendants and Their Roles*

6. Between 2018 and 2024, defendant SHAWN GRYGO operated Evergreen Recovery, Second Chances Sober Living, and related entities. She was responsible for overseeing day-to-day operations of the businesses she operated, and she directed others in processes and practices which facilitated systematic overbilling.

7. Between 2022 and 2024, defendant SHANTEL MAGADANZ was the CEO of Evergreen Recovery. MAGADANZ reported directly to GRYGO. MAGADANZ, like GRYGO, was responsible for overseeing the day-to-day operations of the treatment program at Evergreen Recovery and supervising

other co-conspirators. Magadanz was paid over $600,000 in 2023 and was on track to receive over $1 million in 2024.

8.  Defendant Heather HEIM was responsible for Evergreen Recovery's billing to Medicaid and other health care programs. During her tenure, which ran from 2018 through 2024, HEIM held multiple titles including "Compliance Officer," "Operations Director," "Chief Operating Officer," and "Chief Financial Officer." HEIM was responsible for assisting the defendants in developing and implementing company practices and policies, including charting and billing practices designed to facilitate systematic overbilling.

## *Overview of False and Fraudulent Billing Practices*

9.  The defendants devised, implemented, and carried out the fraudulent scheme against Medicaid and other health care programs in several ways:

10. The defendants developed and implemented a set of attendance-related procedures for group counseling sessions that allowed clients to be billed for group attendance without verification by the licensed counselors actually leading the groups. These procedures facilitated systematic overbilling related to group counseling services.

11. As part of the scheme, the defendants directed Evergreen Recovery staff to hand write client names to add them to counselors' attendance logs

after the logs were signed and turned in by counselors, without the counselors' knowledge or permission.

12. Because continuation of the scheme required that Evergreen Recovery remain licensed as a treatment provider, GRYGO misrepresented Evergreen Recovery's attendance and verification procedures to state regulators when Evergreen was up for licensing reviews and audits.

13. The scheme also required an active enrollment of Medicaid-eligible clients. To further the scheme, the defendants increased the client base, from 30 clients in and around 2018 to nearly 600 clients in and around 2024. Even after the defendants were made aware of repeat corrective orders by state regulators indicating Evergreen's group sizes violated maximum sizes set by state statute, they continued to operate the program at ratios which violated size caps and maximized overbilling.

14. The scheme also included false and fraudulent practices designed to facilitate overbilling for one-on-one counseling services. The defendants periodically reviewed lists of clients who had not had one-on-one counseling with their primary counselors that week. The defendants used the list as a call list for unscheduled phone calls to clients. The defendants caused these calls to be charted as a 31-minute treatment service and billed as a full 60-minute unit of one-on-one counseling, even where the calls lasted fewer than 31 minutes.

*United States v. GRYGO et. al.*

15. The scheme also included false and fraudulent practices designed to facilitate overbilling for treatment coordination services. The defendants caused unscheduled phone calls and text messages to sober house managers, and attempted calls to clients, to be charted and billed as being 8-minutes of individual treatment coordination (which were then billed as 15-minute units) even where the calls and attempted calls were not eligible for billing.

16. It was also part of the scheme that the defendants created and caused to be created electronic health record chart entries weeks or months after the purported date of services. On at least one occasion, the defendants and others stayed at the office all night before a visit by licensing regulators in order to create hundreds of untimely chart entries.

17. As part of the scheme, the defendants also hired "Peer Coaches" to provide billable services to Evergreen clients. The defendants directed Evergreen's "Peer Coaches" to log their time and activities in a manner that misrepresented the circumstances under which they were interacting with clients in order to facilitate systematic overbilling.

18. As part of the scheme, the defendants also billed Medicaid and other health care programs for lunches provided to Evergreen clients. They billed such lunches as a full billable unit of treatment services, even where clients only spent several minutes receiving food and having their attendance taken.

*United States v. GRYGO et. al.*

### *Free Housing Kickback and the Medicaid Overbilling Scheme*

19. Medicaid does not allow a treatment provider to get paid based on claims generically indicating a certain number of clients attended services each day. Instead, Medicaid requires a provider to submit specific claims using the real names of Medicaid-eligible individuals.

20. In order to induce Medicaid-eligible patients to enroll in the program, the defendants and others recruited people from homeless shelters and encampments, residential drug treatment programs, and county probation offices looking for places to put people being released from jail. As part of the scheme, the defendants and others used the promise of free housing as renumeration for attendance of billable services (and used the parallel threat of clients being kicked out of housing as a penalty for non-attendance) to maximize systematic overbilling.

21. The defendants and others told clients at intake, and repeatedly throughout their time with Evergreen Recovery, that their entitlement to free housing was contingent on their attending at least five group counseling sessions per week and a weekly individual session with their primary counselor. If a client's attendance fell short of the requirement, the defendants and others threatened clients with being locked out of free housing and having their belongings put on the curb, all in order to compel utilization of services.

*United States v. GRYGO et. al.*

### ***Extending Client Treatment Duration to Facilitate Overbilling***

22. Because each individual client represented potential revenue for as long as they were in the program, it was part of the scheme to keep clients enrolled in Evergreen programming as long as possible.

23. As one mechanism by which this was accomplished, the defendants limited how many clients at a time were permitted to "step down" or reduce the number of groups they attended each week.

### ***Misuse and Laundering of Reimbursement Payments***

24. The defendants used fraud proceeds to pay themselves and others excessive salaries and for lavish personal spending, including: chartered private jets, country club memberships, real property, luxury vehicles, and designer clothing and handbags.

25. In early 2024, the defendants were notified that Evergreen Recovery was under investigation for false claims and illegal kick-backs. After receiving that notice, the defendants continued to engage in monetary transactions with fraud proceeds.

26. By late June and into July of 2024, GRYGO was unable to pay Evergreen Recovery staff wages and had stopped making rent payments on Evergreen Recovery's facility. GRYGO misrepresented to staff that there were sufficient funds and that payment of wages was forthcoming. Dozens of staff

*United States v. GRYGO et. al.*

members continued to work and provide services for free for several pay periods until operations ceased in late July 2024.

## COUNT 1
(Conspiracy to Commit Wire Fraud)

27. The allegations set forth in paragraphs 1 through 28 of this Indictment are re-alleged as if fully set forth herein.

28. From at least in or about March 2018 through in or about July 2024, in the State and District of Minnesota and elsewhere, the Defendants,

**SHAWN GRYGO,
SHANTEL MAGADANZ, and
HEATHER HEIM,**

did knowingly and willfully conspire, combine, and agree with each other and with other persons known and unknown to the Grand Jury, to commit the crime of wire fraud, in violation of Title 18, United States Code, Section 1343. All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-10
(Wire Fraud)

29. The allegations set forth in paragraphs 1 through 28 of this Indictment are re-alleged as if fully set forth herein.

30. On or about the following dates, in the State and District of Minnesota and elsewhere, the Defendants,

**SHAWN GRYGO,
SHANTEL MAGADANZ, and
HEATHER HEIM,**

11

United States v. GRYGO et. al.

each aiding and abetting and being aided and abetted by others known and unknown to the Grand Jury, having devised and intending to devise the scheme and artifice described above, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce the following writings, signs, signals, pictures, and sounds for the purpose of executing and attempting to execute such scheme and artifice:

| Count | Date of Wire (on or about) | Wire Details |
|---|---|---|
| 2 | September 22, 2022 | $84,970.44 Invoice 4421 issued from Evergreen Recovery to UCare |
| 3 | September 29, 2022 | $80,724.64 Invoice 4444 issued from Evergreen Recovery to UCare |
| 4 | March 23, 2023 | $140,767.58 Invoice 5401 from Evergreen Recovery to UCare |
| 5 | July 10, 2023 | $170,684.96 Invoice 6317 from Evergreen Recovery to UCare |
| 6 | July 27, 2023 | $192,523.15 Invoice 6483 issued from Evergreen Recovery to UCare |
| 7 | August 24, 2023 | $218,310.79 Invoice 6720 from Evergreen Recovery to UCare |
| 8 | August 31, 2023 | $225,943.00 Invoice 6761 from Evergreen Recovery to UCare |
| 9 | September 28, 2023 | $51,570.36 Invoice 7135 from Evergreen Recovery to UCare |
| 10 | November 22, 2023 | $89,271.20 Invoice 7837 from Evergreen Recovery to MN Medical Assistance |

All in violation of Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 2.

## COUNTS 11–13
(Monetary Transactions with Proceeds of Specified Unlawful Activity)

31. Paragraphs 1 through 29 are incorporated herein by reference.

32. On or about the dates set forth below as to each count, the the Defendant,

**SHAWN GRYGO,**

did knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is violations of Title 18, United States Code, Sections 3149 and 3143 (Conspiracy to Commit Wire Fraud, and Wire Fraud), knowing that the property involved in the financial transactions was derived from some form of criminal activity:

| Count | Date (On or about) | Description of Financial Transaction |
|---|---|---|
| 11 | February 23, 2024 | Payment of $37,972 (charged to credit card subsequently paid via wire payment from Evergreen Recovery business account) to Louis Vuitton |
| 12 | May 16, 2024 | Payment of $28,733 (charged to credit card subsequently paid via wire payment from Evergreen Recovery business account) to Louis Vuitton |
| 13 | June 14, 2024 | Payment of $31,862 (charged to credit card subsequently paid via wire payment from Evergreen Recovery business account) to Louis Vuitton |

All in violation of Title 18, United States Code, Section 1957.

*United States v. GRYGO et. al.*

## FORFEITURE ALLEGATIONS

Upon conviction of Counts 1-10 of this Indictment, the defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

Upon conviction of Counts 11-13 of this Indictment, defendant SHAWN GRYGO shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, or any property traceable to such property.

If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____          _____
UNITED STATES ATTORNEY                              FOREPERSON